IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **KERRON BROWN and JUSTIN MALLORY,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SIRCHIE ACQUISITION COMPANY, LLC; CITY OF ATLANTA, GEORGIA; CITY OF DOUGLASVILLE, GEORGIA; MICHAEL WISKEMANN and ARTHUR FERNKORN** | : | **CIVIL ACTION NO.** |
| | : | **1:16-CV-175-SCJ** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

Plaintiffs Kerron Brown and Justin Mallory each spent approximately a month in jail before forensic labs determined that field drug tests of substances in their possession in fact returned false positives.  Each now sues the drug test manufacturer for products liability claims, and the municipality within which their arrests occurred, under 42 U.S.C. § 1983 and several state law causes of action.  Mallory also asserts a negligence claim against his arresting officer (Michael Wiskemann), and an Atlanta Police Department investigator (Arthur

Fernkorn).  Doc. 2.[1]  All defendants have moved to dismiss for failure to state a

claim or for judgment on the pleadings.  Docs. 13, 30, 33.

## I.   BACKGROUND[2]

"On January 19, 2014, Plaintiff Kerron Brown had his backpack," which

contained Niacin and vitamin B12, "searched by the Douglasville Police

Department."  Doc. 2 at 6.  The police "did a field drug test on the Niacin and B12

using a NARK II Drug Test Kit manufactured and sold by Defendant Sirchie."

Id.  The test showed the vitamins "to be Methamphetamines and MDMA

(Ecstasy)."  Id.  Brown was charged with drug trafficking as a result.  Id. at 6.

On February 18, 2014, the seized vitamins "were transferred to the GBI

Forensic Laboratory."  Doc. 2 at 6.  Brown remained in  jail until a lab test on

March 27, 2014 "showed [that] the Niacin and B12 were not controlled substances

and the charges were dropped."  Id.

Atlanta police stopped plaintiff Justin Mallory on February 14, 2014 for

suspected DUI.  Doc. 2 at 6.  At the time, he "had several baking ingredients and

---

[1]  All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

[2]  Because this matter is before the Court on a Federal Rule of Civil Procedure 12(b)(6) motion (Rule 12(c) motions are subject to the same standard, see infra), "the court must accept all factual allegations in [the] complaint as true and take them in the light most favorable to plaintiff."  Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1246 (11th Cir. 2016).

incense in his vehicle." Id. at 7. "Defendant Wiskemann and Defendant Fernkorn[] did a field drug test on the baking ingredients and incense using a NARK II Drug Test Kit manufactured and sold by Defendant Sirchie." Id. That test, like Brown's, showed methamphetamine, and led to drug trafficking charges for Mallory. Id.

Five days after Mallory's arrest, "[t]he baking ingredients and incense were transferred to the GBI Forensic Laboratory." Id. He remained in jail for "30 days before he was granted a bond." Id. A "forensic laboratory test on April 16, 2014 [later] showed [that] the baking ingredients and incense were not controlled substances and the charges were dropped." Id. Both Mallory and Brown "lost their jobs," "had their lives significantly disrupted[,] and continue to be stigmatized as drug traffickers" "due to the[ir] lengthy incarceration[s] and the seriousness of the charges" that ultimately stemmed from "the erroneous field drug test results." Doc. 2 at 7.

"Sirchie markets and represents the NARK II Drug Test Kits as a valid test for whether or not an unknown substance may or may not be a controlled substance." Doc. 2 at 4. "[F]or numerous years," Sirchie has "marketed . . . the kits as being reliable and accurate" despite knowledge that they "are inaccurate, unreliable and return 'false positives' in testing unknown substances." Id.

What's more, Sirchie knows "that they cannot eliminate 'false positives' in testing unknown substances."  Id.

Sirchie also "has actual knowledge that law enforcement agencies rely upon their representations that their field drug test kits are reliable and accurate. Doc. 2 at 4.  At the same time, it knows that "innocent people are wrongly incarcerated," some for extended periods of time, "solely on the basis of inaccurate 'false positive' field drug test kits results."  Id.  Those people, as Sirchie is well aware, suffer stigma "for the rest of their life" as a result.  Id. at 5. "Sirchie [nevertheless] continues to manufacture, sell and market these drug test kits as reliable, despite actual knowledge of the risk of 'false positive' results of the drug test kits and the irreparable damage that can be done to innocent members of the general public because of these . . . erroneous results."  Id.

Sirchie does inform "users that false positives cannot be eliminated and [that] a forensic laboratory test is required to positively identify an unknown substance."  Doc. 2 at 5.  Sirchie, however, knows that warning is "ineffective to safeguard the general public from the danger of the 'false positive' results from the field drug test kits" because it knows that it "will never reach the members of the general public it is meant to protect and . . . that the general public at risk has no control over the timing of the required subsequent laboratory analysis to

confirm or disprove the false positive result." Id. Finally, Sirchie also knows that "despite [its] marketing of these field drug test kits as reliable, [it] has no control over how the[] test kits are used and no control over the avoidance of contaminates that may impact the results." Id. at 6.

Plaintiffs assert four claims and seek punitive damages against Sirchie because of its knowledge and product: (1) defective design; (2) inadequate warning; (3) fraudulent and reckless misrepresentation; and (4) negligence. Doc. 2 at 8-11. Against Defendants Wiskemann, Fernkorn, and the City of Atlanta (the Atlanta Defendants), Plaintiffs ply a negligence claim, while they assert vicarious liability and failure to train and supervise claims against the Cities. Id. at 11-13. Against the Cities (Douglasville and Atlanta), Plaintiffs assert two claims under § 1983: (1) "failure to implement appropriate policies and practices to timely verify positive presumptive test results," and (2) failure to train and/or supervise. Doc. 2 at 14-15. The Atlanta Defendants and Sirchie move to dismiss (docs. 13 & 30), while Douglasville filed a perfunctory Rule 12(c) motion piggybacking off of Sirchie's. Doc. 33.

## II.    STANDARD OF REVIEW

As noted, on motions to dismiss, courts accept

the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Hill v. White, 321 F.3d 1334, 1335 (11th Cir.

2003). However, "conclusory allegations . . . are not entitled to an assumption of truth-legal conclusions must be supported by factual allegations." Randall v. Scott, 610 F.3d 701, 709-10 (11th Cir. 2010). To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face," meaning it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Bishop v. Ross Earle & Bonan, P.A., 817 F.3d 1268, 1270 (11th Cir. 2016).[3]

## III.    ANALYSIS

Plaintiffs' claims divide neatly into two groups: those against Sirchie, and those against the Atlanta Defendants (and the City of Douglasville).[4] Sirchie first.

### A.    Sirchie

Plaintiffs' first allege that Sirchie defectively designed its drug test kit.

---

[3] "The standard of review for a motion for judgment on the pleadings is 'almost identical to that used to decide motions to dismiss.' Doe v. Bd. of Cnty. Comm'rs, 815 F. Supp. 1448, 1449 (S.D. Fla. 1992) (citing Miami Herald Pub. Co. v. Ferre, 636 F. Supp. 970, 974 (S.D. Fla. 1985)). Judgment on the pleadings should be granted where 'there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.' Scott v. Taylor, 405 F.3d 1251, 1253 (11th Cir. 2005) (citing Cannon v. City of W. Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001))." Esys Latin Am., Inc. v. Intel Corp., 925 F. Supp. 2d 1306, 1309 (S.D. Fla. 2013).

[4] Douglasville's Rule 12(c) motion piggybacks off of Sirchie's motion to dismiss. Doc. 33-1 at 2. But the claims against Sirchie do not mirror those against Douglasville. Instead, Plaintiffs assert the same claims against the City of Atlanta and Douglasville. The Court accordingly groups Douglasville with the Atlanta defendants for analytical purposes.

They also contend that Sirchie inadequately warned of the product's dangers, fraudulently misrepresented the product's reliability and accuracy to law enforcement customers, and negligently manufactured a product knowing that it was defective and would result in innocent people incarcerated.  The Court treats each claim in turn.

1.    *Design Defect*

"Under Georgia law, the maker of an article for sale or use by others must use reasonable care and skill in designing the article so that it is reasonably safe for the purposes for which it is intended and for other uses which are foreseeably probable."  J. Kennard Neal, Ga. Products Liability Law § 7:1 (4th ed.).  "To recover on [a] defective design claim[], Plaintiff[s] must establish that (1) the [product's] design is defective and (2) the defective design caused [their] injuries."  Bryant v. BGHA, Inc., 9 F. Supp. 3d 1374, 1383 (M.D. Ga. 2014).  To determine if a given design is defective, courts must balance the "risks inherent in a product design against the utility of the product so designed."  Banks v. ICI Americas, Inc., 264 Ga. 732, 735 (1994).

"The 'heart' of a design defect case is the reasonableness of selecting from among alternative product designs and adopting the safest feasible one."  Jones

v. NordicTrack, Inc., 274 Ga. 115, 118, 550 S.E.2d 101, 103 (2001); see also Banks, 264 Ga. at 735 ("One factor consistently recognized as integral to the assessment of the utility of a design is the availability of alternative designs, in that the existence and feasibility of a safer and equally efficacious design diminishes the justification for using a challenged design.").  That said, alternative design availability remains but a factor in the risk/utility analysis—it is not dispositive. Banks, 264 Ga. at 736.  Other considerations include:

> the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance.

Id. at 736 n.6.  Despite the existence of design defect liability, however, manufacturers need not "insure[] that its product is, from a design viewpoint, incapable of producing injury."  Id. at 737.

"[B]ecause the product at issue is a presumptive drug test kit," say Plaintiffs, "there is no reasonable alternative design."  Doc. 34-1 at 3.  Put differently, "the design defect [here] is an inherently objective defect"—i.e., drug

8

test kits will *always* return false positives, no matter the design.  Id.  For that reason, insist Plaintiffs, "[t]he risk-utility" analysis "is inapplicable."  Id. at 4.  "Simply put," their "design defect claims rest[s] on the fact that . . . Sirchie knew the drug test kits were objectively defective," and knew third parties (the labs conducting follow-up tests and the law enforcement personnel ordering them) had "to take timely action" in order to render the product safe.  Id.

Sirchie sees as fatal Plaintiffs' failure to make any reasonable alternative design allegations.  Doc. 30-1 at 10.  Were that alone not enough, notes Sirchie, "Plaintiffs make no allegations whatsoever regarding the risk or utility of the NARK II Test Kit design."  Id. at 11.  The complaint instead "simply assert[s] that the product is purportedly defective because it can return false positive results."  Id.  That's not enough to nudge a design defect claim into plausible territory and thus, contends Sirchie, it must be dismissed.

Sirchie's right.  The only allegation relevant to design defect in the First Amended Complaint is that drug test kits return false positives.  From that Plaintiffs conclude that a defect exists.  The complaint contains no facts about reasonable alternative designs, nor does it include anything that relates to the utility of the kits.

Even if the Court accepts that false positives constitute a "danger," that fact cannot hurdle a motion to dismiss. Plenty of products are dangerous. Much more so than a drug test kit gone wrong. A chainsaw, for example, can kill quite easily, even if used properly. So can cars, guns, a cornucopia of pharmaceuticals, and any number of other products. Dangerousness does not equal defect though. See Banks, 264 Ga. at 737 (manufacturers need not "insure[] that its product is, from a design viewpoint, incapable of producing injury").

Again, at no point do Plaintiffs allege that the dangers of Sirchie's product outweigh its utility. Instead, they ply a somewhat circular argument that presumes too much. Drug test kits return false positives. Even Sirchie admits that. Plaintiffs then leap to conclude that false positives constitute defects (specifically, "objective" defects). But "defective" does not follow from the existence of a characteristic. The risk of a false positive must outweigh the benefits that field drug tests provide. See Banks, 264 Ga. at 735. Plaintiffs provide no factual allegations that enable the Court to even begin that analysis. Instead, they claim that an "objective" defect, a term located nowhere in relevant case law, obviates the need for any balancing test.

Stepping back from the legal intricacies of design defect claims helps

highlight Plaintiffs' claim's shortfalls.  Field drug tests are not marketed as unfailingly correct, much like cars are never said to unfailingly get you from point A to point B.  Instead, police use them to provide a data point in determining whether probable cause to arrest exists (or not).  Rather than having officers arrest based on a hunch (i.e., "that looks like marijuana to me"), field tests give officers a real-time, science-based (if not infallible) method for deciding whether they can constitutionally arrest someone.

That constitutes a real benefit that must be balanced against the alleged danger of false positives.  See Banks, 264 Ga. at 735.  Yet, Plaintiffs fail to allege any facts that enable such a comparison.  Indeed, they never even *conclude* that the dangers of test kits outweigh their benefits.  Simply stating that a product feature amounts to a defect, as Plaintiffs have, is not enough to sustain a design defect cause of action.  Plaintiffs' claim thus fails.

### 2.    *Failure to Warn*

The manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger. This duty arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product.  Under Georgia law, a manufacturer breaches its duty to warn if it fails to (1) adequately communicate the warning to the ultimate user or (2) fails to provide an adequate warning of the product's potential risks.  A failure to communicate a warning can involve issues like the location and

11

> presentation of the warning.  The failure to adequately warn, by contrast,
> depends upon the substance of the warning.

Bryant, 9 F. Supp. 3d at 1383 (quotes and footnotes omitted).

> For a warning to be adequate, it must provide a 'complete disclosure of the
> existence and extent of the risk involved.' Pavlides v. Galveston Yacht
> Basin, 727 F.2d 330, 338 (5th Cir. 1984) (citing Alman Brothers Farm & Feed
> Mill, Inc. v. Diamond Laboratories, Inc., 437 F.2d 1295, 1303 (5th Cir.
> 1971)).  Whether a warning is legally sufficient depends upon the language
> used and the impression that such language is calculated to make upon the
> mind of the average user of the product.  Pavlides, 727 F.2d at 338 (citing
> Bituminous Casualty Corp. v. Black & Decker Manufacturing Corp., 518
> S.W.2d 868, 873 (Tex. Civ. App.—Dallas 1974); Shell Oil Co. v. Gutierrez,
> 119 Ariz. 426, 434, 581 P.2d 271, 279 (Ct. App. 1978)) (citation omitted).
> The adequacy of the warning must be evaluated in conjunction with the
> knowledge and expertise of those who may be reasonably expected to use
> or otherwise come in contact with the product as it proceeds along its
> intended marketing chain.  Martinez v. Dixie Carriers, Inc., 529 F.2d 457,
> 465–466 (5th Cir. 1976). See also, Stiltjes v. Ridco Exterminating Co., 178
> Ga. App. 438, 343 S.E.2d 715, 719 (1986), aff'd, 256 Ga. 255, 347 S.E.2d 568
> (1986) (where product sold to particular group or profession,
> manufacturer is not required to warn against risks generally known to
> such group or profession).

Thornton v. E.I. Du Pont De Nemours & Co., 22 F.3d 284, 289 (11th Cir. 1994).

Plaintiffs ply a failure to adequately warn claim, not the failure to

communicate version.  Sirchie plainly had a duty to warn law enforcement

agencies and officers that its drug tests could return false positives (and

negatives) because those people are its customers.  It did so by including on the

test kits two sentences: "There is no drug identification system presently in use

which completely eliminates the occurrence of false positives and false negatives. A forensic laboratory is required to qualitatively and quantitatively identify an unknown substance." Doc. 34-1 at 7. Plaintiffs never allege that message failed to adequately warn the kits' actual users of the false positive risk.

Instead, Plaintiffs claim that it failed to adequately warn criminal defendants. Doc. 34-1 at 8. Sirchie, however, never marketed the kits to that group. Indeed, it appears that only law enforcement entities purchase its kits. Sirchie thus had no duty to warn defendants, even if use of the kits might play a role in their arrests. See Thornton, 22 F.3d at 289.

Thornton is instructive. There, the wife of a car dealership owner sent a home repair crew to her husband's business to obtain lacquer thinner, designed for and marketed to "professionals in the automotive refinish industry," for removing carpet glue from her home's floor. Id. at 286. One of the repairmen then used a floor buffer and the thinner to remove the glue. The buffer caused the thinner to ignite, burning the repairman, who later sued the thinner's manufacturer (Du Pont) for failure to adequately warn. Id. at 288-89.

"The record," like the one before this Court, "reveal[ed] that Du Pont marketed the subject product solely to professionals." Id. at 289. Also as in this

case, "[t]he product carried a warning of the hazards connected with its use." Despite "[t]he general rule in Georgia . . . that the adequacy of the warning is an issue for the jury," Thornton concluded that the "warning was reasonably calculated to reach the average user[,] . . . contained clear and simple language," and thus as a matter of law was "adequate." Id.

So too here.  Sirchie's test kits were marketed exclusively to law enforcement agencies.  Any warning duty it owed, then, was to those agencies and their officers much as Du Pont only owed a warning duty to those paint professionals who purchased its lacquer thinner.  See Thornton, 22 F.3d at 289. Sirchie fulfilled that duty by including on the kit a warning that no kit was foolproof and only a lab could quantitatively and qualitatively identify substances as illicit drugs.

It does not matter in this case that Sirchie knew its kits would affect potential criminal defendants.  Pesticide manufacturers know without question that their products will reach consumers on the surfaces of tomatoes, lettuce, and other produce, but those companies have no duty to warn every person who eats fresh fruits and vegetables that they should wash their food before eating it. Instead, the pesticide companies have a duty to warn their customers (farmers) about the dangers their products pose.  Taken to its logical extreme, Plaintiffs' position would require that Sirchie warn virtually every person in America that

14

its kits return false positives (since all people may at some point have contact with the police and be carrying substances that could be mistaken for illicit drugs). That plainly is not what warning requirements aim to achieve.

Sirchie marketed its product solely to law enforcement. It then warned officers that the test kits were not 100% accurate. Because that warning "was reasonably calculated to reach the average user and contained clear and simple language," Plaintiffs' failure to warn claim fails.

### 3.   *Fraudulent Misrepresentation*

"To state a claim for fraudulent misrepresentation, [Plaintiffs] must establish that (1) [Sirchie] made false representations; (2) [Sirchie] knew the representations were false at the time (scienter); (3) [Sirchie] made the representations intending to deceive [Plaintiffs] and induce [them] to perform the work; (4) [Plaintiffs] justifiably relied upon such representations; and (5) [Sirchie's] misrepresentations resulted in damages." Clemons v. Delta Airlines, Inc., 338 Ga. App. 844, 847 (2016).

Plaintiffs "allege that they were injured when Defendant Sirchie induced law enforcement to buy the presumptive drug tests kits through misrepresentation of the reliability of its products." Doc. 34-1 at 9. In particular, they insist that Sirchie markets its kits as reliable while knowing that they produce false positives and "react to a number of non-controlled legal

15

substances."  Doc. 2 at 10.

Plaintiffs' fraud claim fails in multiple ways.  First, the complaint includes no allegations showing that Sirchie's reliability claim is false.  The term "reliable" lacks precise quantitative definition.  In other words, no one says "reliable" to mean 100% accurate, all the time.  Reliable cars still break.  Reliable people still fall short on occasion.  It's not a stretch to say that a reliable drug test might be wrong some of the time.

What's more, a certain amount of "puffery" in marketing remains acceptable.  So, for example, it is not a fraudulent misrepresentation for supplement manufacturers to claim that their particular product is "the best," or provides the "most comprehensive" benefits. Sirchie, at worst, did nothing more than puff.  Doing so did not amount to fraud.

Even if Sirchie knew its statements were false, Plaintiffs never allege that it made those statements intending to deceive people like Plaintiffs.  See doc. 2 at 10.   Nor do they contend that they justifiably relied on those misrepresentations.  Id.  How could they?  Plaintiffs in all likelihood had no idea Sirchie made test kits, much less that they would be arrested, much less that during their arrests officers would test baking materials, incense, and vitamins with those kits.  Regardless, Plaintiffs allegations never mention reliance, instead opting to skip from "Sirchie knew" straight to "and thus caused us injury."  That

16

leap omitted two essential elements of a fraudulent misrepresentation claim and thus submarines Plaintiffs' claim.

        4.    *Negligence*

"To state a cause of action for negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." <u>Fletcher v. Water Applications Distribution Grp.</u>, Inc., 333 Ga. App. 693, 696 (2015).

Plaintiffs' contend that Sirchie breached its duty to the general public to not sell a defective product when it had actual knowledge that the kits returned false positives and that "members of the general public would be incarcerated as a result." Doc. 2 at 10-11. But as discussed above, they fail to allege any legally cognizable defect in Sirchie's test kits. Without a defect, no breach exists (pretermitting the duty element). And no breach means no negligence. Plaintiffs claim thus fails.

## B.   <u>Atlanta Defendants</u>

Plaintiffs press three state law claims against the City of Atlanta and the

individual officers: negligence, vicarious liability, and failure to train and supervise. Doc. 2 at 11-12. They plead two counts under § 1983 against the cities of Atlanta and Douglasville: (1) failure to implement policies to timely verify test results; and (2) failure to train/supervise. Doc. 2 at 14-17. All claims fail.

1. *State law claims against municipalities*

Municipal corporations (i.e., cities like Atlanta and Douglasville) in Georgia are, as a general rule, immune from liability for damages. O.C.G.A. § 36-33-1. Only if a city purchases liability insurance for motor vehicle accidents is that immunity waived, and then only for injuries from car wrecks, not incidents like false arrest. Id.; O.C.G.A. § 33-24-51; O.C.G.A. § 36-92-2; Primas v. City of Milledgeville, 296 Ga. 584, 584 (2015).

Plaintiffs contend that the two cities negligently performed a ministerial duty (which are exempted by statute from the general immunity rule) and thus remain liable. See doc. 25-1 at 5-6. "[C]onducting a field drug test," and verifying "positive field test results in a timely manner," say Plaintiffs, constitute ministerial acts that can spawn liability. Doc. 2 at 12.

"A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts,

18

reaching reasoned conclusions, and acting on them in a way not specifically directed." Hemak v. Houston Cty. Sch. Dist., 220 Ga. App. 110, 112 (1996). Deciding (1) whether to test substances found during the course of a detention, and (2) when to send those substances to a lab for further testing, are not "simple, absolute, and definite" tasks that require simple "execution of a specific duty."[5] Id. Instead, those are prime examples of discretionary actions (much like the decision to arrest itself) for which municipalities remain immune.  All of Plaintiffs' state law claims against the City of Atlanta and Douglasville, then, perish.

> 2.   *State law claims against defendants Wiskemann and Fernkorn*

Plaintiffs assert a single negligence claim against the officer defendants in their individual capacities.  Doc. 2 at 11-12.  Defendants claim the official immunity mantle again.  Doc. 13 at 15.

Public officials, like police officers,

---

[5] In discussing qualified immunity, Plaintiffs complain that "Defendants . . . try to blur the discretionary/ministerial" line by focusing on the decision to test instead of the "act of dropping the unknown substance into a bag, adding fluid and seeing if it changes color," and the "failure to verify the results."  Doc. 25-1 4.  The latter two actions, say Plaintiffs, are ministerial and led to their detentions.  No.  The physical actions one takes to operate a field drug test no more caused Plaintiffs to remain in jail than the act of act of getting up in the morning leads to a person's accidental death later in the day.  Jail and judicial officials control detention post-arrest, not on-scene officers who handcuff people and use field tests.  And, as discussed above, the decision on when to send substances to a lab for further testing is not even ministerial.

may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.  In other words, public officials are immune from damages that result from their performance of discretionary functions, unless those functions were undertaken with malice or intent to cause injury.

Carter v. Glenn, 249 Ga. App. 414, 416 (2001) (cites omitted).

As discussed above, Wiskemann and Fernkorn engaged in discretionary, not ministerial, activities when they used the Sirchie test kits.  To overcome immunity, then, Plaintiffs must allege that Defendants acted with "malice or intent to cause injury."  Id.  They allege nothing of the sort, instead pleading that "Defendant Fernkorn and Defendant Wiskemann negligently performed their ministerial functions."  Doc. 2 at 12.  Those defendants, like the cities, therefore, are officially immune.[6]

3.   *Section 1983 claims against municipalities*

"As a municipality, the [Cities] cannot be held vicariously liable under § 1983 for constitutional violations committed by [their] officers.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 693–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). [Plaintiffs] must ultimately prove that [they] had a policy, custom, or practice

---

[6]   Notably, the complaint only mentions Wiskemann and Fernkorn once: "Defendant Wiskemann and Defendant Fernkorn[] did a field drug test on the baking ingredients and incense using a NARK II Drug Test Kit manufactured and sold by Defendant Sirchie."  Doc. 2 at 7.  Immunity issues aside, that's simply not enough to sustain any claim against the officers.

that caused the deprivation.  See e.g., City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); Weiland v. Palm Beach County Sheriff's Office, 792 F.3d 1313, 1328 (11th Cir. 2015); McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)."  Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016).  At the motion to dismiss stage, however, the "touchstone of [a] § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of civil rights protected by the Constitution."  Id. at 1280 (quoting Monell, 436 U.S. at 690).

Nowhere in their complaint do Plaintiffs identify the constitutional right they allege that Defendants violated.  In their response brief, Plaintiffs cite Gerstein v. Pugh, 420 U.S. 103 (1975), to argue that their detention until a lab conclusively identified the substances found in their possession violates their Fourth Amendment rights.  Doc. 25-1 at 7.  But Gerstein merely stands for the proposition that a neutral magistrate must determine the existence of probable cause "as a prerequisite to extended restraint of liberty following arrest."  420 U.S. at 114.  It says nothing about whether a § 1983 plaintiff adequately alleges (Plaintiffs here do not) a lack of probable cause to justify detention.[7]

---

[7]  Elsewhere in their brief Plaintiffs conclude that the length of their detentions violated an unmentioned constitutional right.  See, e.g., doc. 25-1 at 9.  Detention length can, as a general proposition, undergird constitutional claims, but Plaintiffs provide no plausible factual allegations to support such a theory.  Instead, they lean on the consequences of their detentions – lost jobs, near-homelessness, etc. – to serve as

Even assuming that Plaintiffs can hurdle the constitutional right bar (a relatively low pleading threshold to clear), they fail to adequately allege a policy or custom that results in unconstitutional detentions.  They allege that (1) Atlanta and Douglasville "failed to implement a policy requiring that . . . test kits be confirmed immediately to avoid unnecessary lengthy incarceration of suspects in the event of a false positive" (doc. 2 at 14), and (2) the Cities failed to train officers how to conduct drug tests, but offer no more detail than that.  Id. at 15.

"In limited circumstances, a local government's decision not to train certain employees . . . to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1328 (11th Cir. 2015).  That training, however, "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989).  To show that deliberate indifference, plaintiffs must ordinarily allege "[a] pattern of similar

---

elemental stand-ins.

Although those effects certainly show harm, they do not, absent more, show that their confinement itself infringed their rights.  Plaintiffs had been charged with crimes and their detention before trial does not, standing alone, violate the Constitution.

constitutional violations." Weiland, 792 F.3d at 1328.[8]

Plaintiffs never allege that required pattern.  Instead, they offer two incidents in Atlanta (one in their motion to amend, discussed below) that occurred a year and half apart and one in Douglasville.  What they lack are facts suggesting that the two Atlanta incidents should have given city officials notice of a training problem (something like facts showing that Atlanta rarely used test kits over the last two years and thus that two incorrect results should have highlighted problems with their use).  And the Douglasville incident as a solo occurrence by definition is not a pattern.  See Weiland, 792 F.3d at 1329 (claim arising from single incident did not "allege a pattern of similar constitutional violations by untrained employees").

Plaintiffs' failure to implement allegations also fall short of stating a claim. They say that Atlanta and Douglasville knew that Sirchie's test kits returned false positives, yet failed to put in place a policy requiring that their results "be confirmed immediately."  Doc. 2 at 14.  Aside from the practical impossibility of that policy (lab tests take at least some time), the allege no facts that plausibly suggest either city could control the actions of the Georgia Bureau of

---

[8] Plaintiffs may avoid pattern allegations if the need for training is "'so obvious' that the failure to provide such training amounts to deliberate indifference." Weiland, 792 F.3d at 1329.  This is not that case.  See id. (the "need for specialized training in the constitutional restrictions on the use of force when dealing with mentally ill citizens" was not "so obvious" as to obviate the need for pattern allegations).

23

Investigation lab that even Plaintiffs acknowledge confirms field tests.  See, e.g., doc. 2 at 7 ("The [substances] were transferred to the GBI [lab] . . . for the required follow up testing 5 days after the field drug test registered a positive.").

Nor does Plaintiffs' suggested policy address the conduct of the systemic actors underlying Plaintiffs' detentions.  The City of Atlanta, for example, has no control over local jails (the Fulton and Dekalb County Sheriffs have that responsibility), or the judicial system (judges set bonds).  Put differently, once Plaintiffs left police custody (presumably when they arrived at jail for booking), Defendants' conduct ceased to meaningfully influence their incarceration.

More importantly, the Constitution imposes no requirement that lab tests confirm field kit results within a certain amount of time.  What it does require is that police have probable cause to arrest, see Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."), which the officers here appear to have had.  It also requires that a judicial officer, within a reasonable amount of time after arrest, determine that probable cause existed if the arrest occurs without a preexisiting warrant.  See Gerstein, 420 U.S. at 126. Plaintiffs allege nothing to suggest a Gerstein violation.

From there, the Constitution mandates that states not require excessive bail

of pretrial detainees, but it does not prohibit detention until trial if necessary to assure the defendant's presence.  See Bell v. Wolfish, 441 U.S. 520, 536-37 (1979) (after a judicial determination of probable cause, "the Government concededly may detain [a pretrial detainee] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.").  There is, of course, a right to a speedy trial, but Plaintiff's one to two month detentions did not overstep that line.

Drug test kit results, and later confirmation lab testing, provide arresting officers probable cause and, in many cases, evidence of a crime.  They do not have a direct impact on bail determinations, except insofar as they support charges that themselves suggest a defendant might be a danger to the community or flee prosecution (i.e., should be denied bail).  Regardless of whether they influence that analysis, neither the occurrence of false positives in test kits, nor the length of time it takes to lab test suspected controlled substances, plays a role in bail determinations or when those are made.  And *that* decision, which in Plaintiffs' experience may have been delayed, underlay their thirty plus day stays in jail.

Put differently, the City of Atlanta and City of Douglasville, the arresting officers, and Sirchie's drug test kits are not responsible for Plaintiffs' detentions.

25

That is not to say that innocent people sitting in jail for extended periods of time is okay—it's not.  But it is one thing to acknowledge that detention based on charges that ultimately are dismissed is undesirable, and another to say that it gives rise to damages claims.

Our criminal justice system is not perfect.  Gaps like the ones Plaintiffs allegedly experienced unfortunately exist.  Nevertheless, the solution is not always monetary recovery.  Even if it should be, the Court is bound by statutes and precedent that say it is not available in the case.  At bottom, Plaintiffs failed to allege any facts that plausibly suggest the City of Atlanta and City of Douglasville should have implemented policies different from any already in place surrounding turning over field-tested substances to the GBI for forensic analysis.  Plaintiffs' claims against those defendants therefore fail.

3.   *Qualified Immunity*

Plaintiffs § 1983 claims against Wiskemann and Fernkorn also fail because both officers are immune from suit.[9]

Qualified immunity protects police officers from suit in their individual capacities for discretionary actions performed in the course of their duties. Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It serves the purpose of allowing 'government officials

---

[9]   The complaint is unclear whether Plaintiffs actually assert any federal claims against Wiskemann and Fernkorn.  To the extent they do, qualified immunity bars those claims as explained below.

26

to carry out their discretionary duties without the fear of personal liability or harassing litigation.' Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted). Under qualified immunity, 'all but the plainly incompetent or one who is knowingly violating the federal law' are shielded from litigation. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Qualified immunity 'does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].' Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting Harlow, 457 U.S. at 815, 102 S.Ct. at 2737 (internal quotation marks omitted) (alteration provided by Holmes )).

Carter v. Butts Cty., Ga., 821 F.3d 1310, 1318–19 (11th Cir. 2016).

Officials claiming the protections of qualified immunity must first show that they acted within the scope of their discretionary authority. Id. at 1319. If they surmount that hurdle as Wiskemann and Fernkorn have (see supra for a discussion of why their actions were not ministerial), "the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate. Overcoming the official's qualified-immunity defense requires a plaintiff to establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." Id. (cite omitted).

Plaintiffs fail to show either a constitutional violation or that clearly established law contained the right they seek to protect. For one, they never allege that Wiskemann or Fernkorn, both arresting officers, lacked probable cause to arrest or otherwise violated their rights. Indeed, Plaintiffs expressly disclaim that their arrests or searches incident to those arrests violated the

Constitution.  <u>See</u> doc. 25-1 at 9 ("Plaintiff does not contest the search and arrest.").  Instead, Plaintiffs claims are based on their post-arrest detention, something that Wiskemann and Fernkorn had nothing to do with.  <u>See</u> doc. 2 at 7 (only allegations in complaint state that the two officers conducted a field drug test; they include nothing about Plaintiffs' detention or the conduct that led to it). That alone merits those defendants' dismissal from this case.

Even if Plaintiffs adequately pled constitutional violations, no case at any level, in any court, has established (clearly or otherwise) that field drug tests cannot, because of possible false positives, support probable cause.  Indeed, at least one court has held quite the opposite—that the possibility of false positives do *not* render field tests insufficient to support probable cause.  <u>See</u> <u>McCabe v. Gonzales</u>, No. 1:13-CV-00435-CWD, 2015 WL 5679735, at *8 (D. Idaho Sept. 25, 2015) ("The fact that the field drug test could have produced a false positive, as McCabe contends, is irrelevant; probable cause does not require certainty so long as an officer reasonably believes that the substance in question is illegal.").  Whether because of a lack of clearly established law or an actual constitutional violation, Wiskemann and Fernkorn are entitled to qualified immunity.

C.   <u>**Motion to Amend**</u>

Plaintiffs seek to add Julius Goldring as a plaintiff, and Vladimir Henry and Juan Restrepo (Goldring's arresting officers) as defendants.  Doc. 24-3 at 1.

Goldring, they say, "has claims . . . that are nearly identical to" Plaintiffs'. Id. at 2.  He, like Plaintiffs, sat in jail for an extended period of time after a Sirchie test kit incorrectly identified sand as cocaine.  Id.  After the GBI lab corrected that mistake, Goldring was released.  Id.

Goldring's identical claims fail for reasons identical to those that undermine Plaintiffs' claims.  Henry and Restrepo are qualifiedly immune from suit on § 1983 claims and officially immune under Georgia law from any state law claims, while the City of Atlanta (where Goldring's arrest took place) is officially immune and otherwise not the target of viable claims.  Hence, Plaintiffs' amend motion is **DENIED**.  Doc. 24.

## IV.   CONCLUSION

Accordingly, Defendants' motions to dismiss (docs. 13, 30, & 33) are **GRANTED**.  Plaintiffs' motion to amend is **DENIED**.  Doc. 24.  The Clerk is **DIRECTED** to close this case.

**SO ORDERED,** this 17th day of February, 2017.

s/Steve C. Jones                              
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)